## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **LANCE FOSTER, et al.,** | } |
| **Plaintiffs,** | } |
| v. | }   Case No.: 4:04-CV-1277-RDP |
| **STOOKSBURY FARMS, et al.,** | } |
| **Defendants.** | } |

### MEMORANDUM OPINION

**I.   INTRODUCTION**

Pending before the court are: (1) Defendants Kay Cassell and Kay Cassell Equine Insurance's (hereinafter referred to collectively as "Insurance Defendants") Motion for Summary Judgment (Doc. # 33) filed on November 10, 2006; (2) Defendants Mount Empire Large Hospital, Dr. Ed Cassell, and Dr. Christy Miller's (hereinafter referred to collectively as "Veterinary Defendants") Motion for Summary Judgment (Doc. # 35) filed on November 10, 2006; and (3) Defendants Stooksbury Farms, Buddy Talbert Quarter Horses, Dona Stooksbury, and Buddy Talbert's (hereinafter referred to collectively as "Seller Defendants") Motion for Summary Judgment (Doc. # 38) filed on November 13, 2006.  Each motion has been fully briefed by the parties, and all three motions came under submission on December 18, 2006.  After a careful review of the record and the arguments made by all parties, the court finds all three motions are due to be granted in part, as to the claims Plaintiffs have abandoned, and denied as to all other claims.  For reasons set forth more fully below, the court concludes that the existence of material factual disputes precludes the entry of summary judgment for any party at this time, and the case is due to be set for a pretrial and trial accordingly.

## II.   STATEMENT OF FACTS

Since 1992, Plaintiffs Lance and Sheri Foster ("Plaintiffs") have run a farm for profit. (Doc. # 36 Ex. A 90–95). Plaintiffs began buying horses for the purpose of showing them in 1999. (Doc. # 36 Ex. A 25). In May 2002, Plaintiffs bought a horse named Im Static from Defendants Stooksbury Farms, Buddy Talbert Quarter Horses, Buddy Talbert, and Dona Stooksbury,[1] after seeing a picture of his sire in the Quarter Horse Journal, doing some internet research, and traveling to Stooksbury Farms to look at horses. (Doc. # 36 Ex. A 15; Doc. # 36 Ex. B 52–56). Plaintiffs testified that they purchased Im Static from Seller Defendants for payment of $30,000 in cash, a trade of two geldings, and the promise that the Plaintiffs would show Im Static and bring him to Stooksbury Farms to breed. (Doc. # 36 Ex. B 68–69, 72). Notwithstanding Plaintiff's express desire to breed Im Static and their prior experience with cryptorchidism[2]—a medical term referring to absence from the horse's scrotum of one or both testes—Plaintiffs did not request that their own veterinarians examine Im Static before purchasing him and claim not to have even visually examined him to determine if he had two properly-descended testicles before the purchase. (Doc. # 36 Ex. A 19, 48, 135; Doc. # 36 Ex. B 17, 34–35, 70–71, 80, 146–147). Defendant Buddy Talbert has testified that, prior to the sale of the colt, he visually and physically examined Im Static in Plaintiffs' presence, and saw and felt two testicles. (Doc. # 33 Ex. E 52, 54).

---

[1] The Sellers, Buddy Talbert d/b/a Buddy Talbert Quarter Horses and Dona Stooksbury d/b/a Stooksbury Farms, constitute a Quarter Horse business that is operated in one location and "just runs together." (Doc. # 44 Ex. 1 at 58–59, 61, 106–107, 125–126). Buddy Talbert and Dona Stooksbury hold themselves out to be partners in the Quarter Horse business. (Doc. # 44 Ex. 1 at 70).

[2] Plaintiffs admit to understanding the nature of a warranty on a purchased colt, and that there are no guaranties when dealing with animals as to how they would mature and grow. (Doc. # 36 Ex. A 100–106).

2

Plaintiffs borrowed the purchase money for Im Static from a bank, which required that they obtain equine mortality insurance. (Doc. # 36 Ex. B 82–83). Defendant Talbert recommended that Plaintiffs contact Defendant Kay Cassell, proprietor of Defendant Kay Cassell Equine Insurance, to obtain insurance because "she was local, and that's who he used." (Doc. # 36 Ex. B 85). Plaintiffs asked either Defendant Talbert or Defendant Kay Cassell to make arrangements for the insurance examination of Im Static. (Doc. # 36 Ex. B 83–84).

On May 15, 2002, Defendant Dr. Christy Miller (who works at Defendant Mount Empire Large Animal Hospital, which is owned by Defendant Dr. Ed Cassell[3]) performed an insurance mortality examination on Im Static. (Doc. # 36 Ex. D 25–26, 108). Dr. Miller visually observed that Im Static had two testicles, palpated them during her examination, and so indicated on the Veterinarian's Certificate of Examination for Equine Mortality Insurance provided by Kay Cassell Insurance. (Doc. # 36 Ex. D 75–77, 106–110, 116–122; Doc. # 36 Ex. H). The form further indicated:

> The purpose of this examination is to identify and examine the involved horse in accordance with this certificate and to report the medical facts obtained by the examination to the insurance company. This Veterinary Certificate of Examination for Mortality Insurance is NOT a statement of insurability or serviceability for any intended use. . . . This certificate should be completed by the examining veterinarian to the best of his or her knowledge and ability as a licensed veterinarian.

---

[3] Defendant Kay Cassell's husband is Defendant Dr. Ed Cassell, who is a veterinarian and owner of Defendant Mt. Empire Animal Hospital. (Doc. # 36 Ex. C 34–35). When Dr. Cassell receives a referral from his wife's insurance agency, he refers the exam to another doctor to avoid the appearance of a conflict of interest, so he referred the pre-insurance examination to Defendant Dr. Christy Miller. (Doc. # 36 Ex. C 28–29).

(Ex. H).[4]  Plaintiffs admit Dr. Miller made no representation regarding the future condition of the colt on the insurance examination form or otherwise.  (Doc. # 36 Ex. A 132–33).

On May 20, 2002, Kay Cassell faxed Plaintiffs an equine insurance application and, according to Plaintiffs, told Plaintiff Sheri Foster that a veterinarian checked Im Static and that he did have two properly descended testicles.  (Doc. # 36 Ex. A 60, 68, 129; Doc. # 36 Ex. B 89–92, 275–276, 278; Ex. K).  On May 21, 2002, Plaintiffs took the insurance application and Bill of Sale issued to them by Defendant Talbert to a bank and obtained a loan for the purchase of Im Static (Doc. # 36 Ex. B 94–97).  Plaintiffs initially took out an insurance policy through Kay Cassell Equine Insurance for mortality and major medical insurance on Im Static, designating him as a "show horse," with a coverage limit of $50,000.00.  (Doc. # 36 Ex. E 39, 41).  Plaintiffs later changed the use designation to "breeding" on December 4, 2003, deleted the major medical coverage on February 25, 2004, and decreased the mortality coverage on the horse from $50,000.00 to $30,000.00.  (Doc. # 36 Ex. E 42–45).  Ultimately, the policy on Im Static either expired or was cancelled.  (Doc. # 36 Ex. E 61).

On June 2, 2002, Plaintiffs left Im Static on the property of Defendant Stooksbury Farms. (Doc. # 36 Ex. B 125).  The horse was transported a couple weeks later to Defendant Bill Coffman in Illinois, a trainer recommended by Defendants Talbert and Stooksbury, in order to be trained for showing.  (Doc. # 36 Ex. B 98–99, 106–107).  During Im Static's stay with Defendant Coffman, the

---

[4]Whether or not the horse is or was cryptorchid would not have any effect on the horse's insurability, or the mortality or major medical insurance policy that Defendant Kay Cassell Insurance issued to Plaintiffs.  (Doc. # 36 Ex. E 62).  Furthermore, Plaintiffs understood that a breeding and semen evaluation of a colt could not be performed until the colt was approximately two years old. (Doc. # 36 Ex. B 36–37, 214–15).

horse was treated by veterinarian Dr. Scott Myers, who did not observe that Im Static was cryptorchid. (Doc. # 36 Ex. L 30–32; Doc. # 36 Ex. B 126). When Plaintiffs next saw Im Static in July 2003 after he was returned to Stooksbury Farms, they were very disappointed in his appearance; specifically, they allege he had a severe fungus, was not well groomed, and had only one testicle in the scrotum. (Doc. # 36 Ex. B 102, 125, 131–32, 137–39, 163–64).

After Plaintiffs informed Defendant Talbert of their observations, he asked Defendant Dr. Ed Cassell to examine Im Static to determine whether he was cryptorchid. (Doc. # 36 Ex. B 144). After examining the colt, Defendant Dr. Cassell called Plaintiff Lance Foster and told him that Im Static had only one testicle.[5] (Doc. # 36 Ex. A 62–63). Despite Plaintiffs' claim that ImStatic is unsuitable for breeding, in August 2003 they attempted to breed Im Static to nine mares, three of which became pregnant. (Doc. # 36 Ex. B 155, 158–60, 193).

In April 2004, Plaintiffs took Im Static to Auburn University to have a breeding soundness exam performed by Dr. Elizabeth Stanton, who examined the colt and determined that he was cryptorchid and, therefore, unsuitable for breeding. (Doc. # 36 Ex. B 171; Doc. # 36 Ex. C 9–14, 18). In November 2004, Dr. Jim Schumacher, who was retained by Defendants to examine ImStatic, found that ImStatic was not cryptorchid but had two testicles in the scrotum, and these findings were later confirmed by Plaintiffs' own observations and Plaintiffs' experts. (Doc. # 36 Ex. A 188–89; Doc. # 36 Ex. B 183; Doc. # 36 Ex. C 36; Doc. # 36 Ex. F 31; Doc. # 36 Ex. J 33–35). On November 15, 2004, Plaintiffs again sent Im Static to Dr. Stanton in Auburn University, where she

---

[5]Plaintiffs concede that Dr. Cassell did not misrepresent anything to them or tell them anything that was not true. (Doc. # 36 Ex. A 62–63, 140; Ex. B 149, 152).

performed another breeding soundness examination and found that Im Static now had both of his testicles in the scrotum and, thus, was no longer cryptorchid. (Doc. # 36 Ex. C 32–34, 36, 55–56). However, she concluded he was still not suitable for breeding due to the quantity and quality of his sperm. (Doc. # 36 Ex. C 32–34, 36, 55–56).

### III.   STANDARD ON SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point

out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

**IV.    ANALYSIS**

In a nutshell, it could be said that this case is about a missing horse testicle that once was lost but later was found.  Actually, the controversy between the parties centers on when exactly the transient testis returned, or if it was really there in the first instance after all.  However, before explaining why this issue is decidedly not one for the court to rule upon as a matter of law, the court must dispense with Plaintiffs' abandoned claims.

**A.    Plaintiffs have abandoned a number of claims in the summary judgment record.**

As all three groups of Defendants point out, Plaintiffs have abandoned several of their claims in their summary judgment briefs.  When a plaintiff fails to argue a claim in opposing summary judgment, the claim is deemed abandoned and is subject to dismissal.  *See Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"); *McMaster v. United States*, 177 F.3d 936, 940–41 (11th

Cir.1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint).

Plaintiffs have abandoned their claims for negligence, wantonness, and conspiracy against the Seller Defendants, so these claims will be dismissed with prejudice. (*See* Doc. # 43). The remaining claims against the Seller Defendants deal with misrepresentation, breach of contract, and breach of warranty, and include claims II through IX of Plaintiffs' Complaint. (*See* Doc. # 1).

Plaintiffs have abandoned *all* claims against Defendant Dr. Ed Cassell, as they have failed to offer *any* supporting facts or argument to substantiate *any* claim against him. (*See* Doc. # 41). In fact, Plaintiffs testified under oath that they sued Dr. Cassell merely because "[t]his is his veterinarian clinic." (Doc. # 36 Ex. B 178–80, Ex. B). This statement, contained in Plaintiff Sheri Foster's deposition, *not* in Plaintiffs' response briefs to summary judgement, is not enough to establish a claim under any of Plaintiffs' theories. Even if Plaintiffs were trying to establish a theory of *respondeat superior* liability for Defendant Dr. Miller's actions (which they have not specifically pled), they have done so by naming her employer, Defendant Mount Empire Large Animal Hospital, and making allegations against it. Accordingly, all claims against Defendant Dr. Ed Cassell will be dismissed with prejudice.

As to the remaining Veterinary Defendants, Plaintiffs have abandoned their breach of contract, breach of warranty, and conspiracy claims on summary judgment. (*See* Doc. # 41). Therefore, these claims shall be dismissed with prejudice as well, and the only remaining claims against these defendants involve theories of professional negligence and misrepresentation, which are embodied in counts I through VII of Plaintiffs' Complaint. (*See* Doc. # 1).

Finally, Plaintiffs have abandoned their claims of negligence, wantonness, suppression, deceit, breach of contract, breach of warranty, and conspiracy against the Insurance Defendants. In their brief opposing summary judgment, Plaintiff fails to mention any of these theories or claims, with the exception of "deceit." Regarding deceit, Plaintiffs admit there is insufficient evidence in the Rule 56 record to substantiate this claim against the Insurance Defendants, stating unequivocally, "[a]gain, there is absolutely no evidence in this case that Cassell deceived the Fosters [Plaintiffs]." (Doc. # 42 at 6). If there is no evidence to substantiate such a claim against Defendant Kay Cassell, there is no evidence to support a claim of deceit predicated on vicarious liability against Kay Cassell Equine Insurance. There can be no liability for the employer if the employee/owner did nothing tortious. *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1503 (11th Cir.1990) (barring vicarious liability action against employer when employee is not liable); *United Steelworkers of Am. AFL-CIO-CLC v. O'Neal*, 437 So.2d 101, 103 (Ala. 1983) (under a theory of *respondeat superior*, exoneration of agent works as an automatic acquittal of employer/principal). Thus, these claims against the Insurance Defendants are due to be dismissed with prejudice, and only the claims relating to misrepresentation and insurance, namely counts III through V and X of Plaintiffs' Complaint, remain against these Defendants.

   **B.**  **None of the Defendant Groups Has Met Its Burden on Summary Judgment.**

The court will not discuss every material factual dispute evidenced in the record, but will instead focus on *the* material factual dispute that is the linchpin of resolving this case: exactly when was Im Static cryptorchid, if at all? Based upon all the evidence submitted, there appear to be three plausible answers to this question. First, it could be that all the Defendant groups are correct and he

was never without both testicles. Second, it may be that Plaintiffs are right and he was cryptorchid when he was examined by Defendant Talbert and Defendant Dr. Miller in May 2002, and this missing testicle finally descended in November 2004. This, of course, would make at least some Defendants liable for the negligence, misrepresentation, and other claims alleged by Plaintiffs. Finally, it could turn out that Defendants' alternate theory is correct: both of Im Static's testicles were intact when he was examined by any of Defendants and when Plaintiffs purchased him. Later, one wayward testis retracted into the inguinal canal, making Im Static cryptorchid when Plaintiffs and Dr. Cassell examined him in July 2003. However, sometime before November 2004 the mysterious testicle must have again descended, as Im Static was no longer cryptorchid when examined by Drs. Schumacher and Stanton. The answer will require a credibility determination by the trier of fact and, therefore, this case cannot be decided by the court on summary judgment. The court is satisfied that both sides have produced sufficient evidence for a reasonable jury to conclude in their favor, and, therefore, will deny summary judgment on this central issue.

## V.    CONCLUSION

As to those claims Plaintiffs have abandoned, all Defendant groups are entitled to summary judgment on these claims, and their motions will be granted in part. However, as to the critical issue of the timing of Im Static's cryptorchidism, which underlies Plaintiffs' remaining claims, none of the Defendant groups has met its burden on summary judgment of demonstrating the absence of any material factual dispute and entitlement to judgment as a matter of law. Therefore, that part of Defendants' motions for summary judgment will be denied. Accordingly, the court will enter an order granting in part and denying in part all three summary judgment motions.

**DONE** and **ORDERED** this ____1st_____ day of March, 2007.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE